## U.S. BANKRUPTCY COURT
### District of South Carolina

Case Number:  11-08066-HB

## ORDER (A) AUTHORIZING AND SCHEDULING AN AUCTION AT WHICH DEBTOR WILL SOLICIT BIDS FOR THE SALE OF ITS ASSETS; (B) APPROVING PROCEDURES FOR SUBMISSION OF COMPETING BIDS; (C) APPROVING BREAKUP FEE PROVISIONS; AND (D) APPROVING THE FORM AND MANNER OF NOTICE OF AUCTION PROCEDURES AND SALE HEARING

The relief set forth on the following pages, for a total of 54 pages, including this page, is hereby **ORDERED.**

**FILED BY THE COURT**
**05/24/2012**



US Bankruptcy Judge
District of South Carolina

Entered: 05/24/2012

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF SOUTH CAROLINA**

IN RE:                        )
                              )
LIBERTY DENIM, LLC,        )     Case No. 11-08066-HB
                              )     Chapter 11
            Debtor.         )
_____)

**ORDER (A) AUTHORIZING AND SCHEDULING AN AUCTION AT WHICH
DEBTOR WILL SOLICIT BIDS FOR THE SALE OF ITS ASSETS; (B) APPROVING
PROCEDURES FOR SUBMISSION OF COMPETING BIDS; (C) APPROVING
BREAKUP FEE PROVISIONS; AND (D) APPROVING THE FORM AND MANNER
OF NOTICE OF AUCTION PROCEDURES AND SALE HEARING**

**THIS MATTER** coming on to be heard and being heard on May 15, 2012, upon the Joint

Motion of Liberty Denim, LLC (the "Debtor") and the Official Committee of Unsecured Creditors

(the "Committee") Pursuant to 11 U.S.C. §§ 105 and 363 and other applicable sections of the

Bankruptcy Code (11 U.S.C. §§ 101 et seq.) and pursuant to Rule 6004 of the Federal Rules of

Bankruptcy Procedure for Orders (A) Authorizing and Scheduling an Auction at Which the Debtor

Will Solicit Bids for the Sale of its Assets; (B) Approving Procedures for Submission of Competing

Bids; (C) Approving Breakup Fee Provisions; (D) Scheduling A Hearing to Conduct Such Sale; (E)

Approving the Form and Manner of Notice of Auction Procedures and Sale Hearing; (F)

Authorizing the Sale of the Assets to Real Estate Diversified, LLC or the Highest Bidder at Auction;

(G) Authorizing the Sale of the Assets to be Free and Clear of All Liens, Claims, Encumbrances and

other Claims of Interest and Transferring Such Claims to the Proceeds of Sale; (H) Approving the

Form of Asset Purchase Agreement; and (I) Granting Related Relief (the "Sale and Procedures

Motion"); capitalized terms not defined in this Order are used herein with the same meaning as

set forth in the Sale and Procedures Motion; and after due and proper notice to all parties in

interest and in consideration of the pleadings herein and evidence presented, the Court makes the following Findings of Fact and Conclusions of law:

1.     On December 31, 2011, the Petitioning Creditors filed an involuntary petition under Chapter 7 of the Bankruptcy Code (11 U.S.C. § 101 et seq.) against Liberty Denim, LLC (the "Debtor").  An Order for Relief was entered under chapter 11 of the Bankruptcy Code on March 2, 2012.  No trustee or examiner has been appointed in this case and the Debtor continues to manage its affairs as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108.  The Debtor's bankruptcy case is that of an orderly liquidation case under Chapter 11.

2.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, 11 U.S.C. §§ 363, 1107, 1108, and other applicable sections of the United States Bankruptcy Code. This is a core proceeding pursuant to 28 U.S.C. § 157.

3.     At the time of the filing of the petition herein, the Debtor owned certain machinery and equipment, inventory, other tangible personal property, accounts receivable and real estate. A majority of the machinery and equipment owned by the Debtor is located in the Debtor's manufacturing facility located at 101 Mills Avenue, Liberty, South Carolina (the "Liberty Denim Manufacturing Facility"). It has been determined by the Debtor and the Committee that numerous parties were interested in purchasing the Liberty Denim Manufacturing Facility, including the real estate and all personal property therein. As a result, the Debtor and the Committee have received offers to purchase the Liberty Denim Manufacturing Facility and/or other assets and to become a "stalking horse bidder" for such assets. After due consideration of such offers, the Debtor and the Committee entered into negotiations and finalized an Asset Purchase Agreement with Real Estate Diversified, LLC, an Alabama limited liability company (or its assigns) (the "Purchaser"). The Asset Purchase Agreement was attached to the Sale and

Procedures Motion as Exhibit "A". The assets being sold pursuant to the Asset Purchase Agreement are referred to herein as the "Purchased Assets."

4.      As a result of entering into the Asset Purchase Agreement, the Debtor and the Committee filed the above referenced Sale and Procedures Motion with this Court on April 24, 2012.  Due and proper notice of the hearing on all matters identified in the Sale and Procedures Motion was given to all parties in interest, and no further notice is required.

5.      For good cause shown as based upon the weight of the evidence presented, the record in this proceeding and all facts and circumstances in this particular case and in consideration of the arguments of all counsel, the Court makes further Findings of Fact and Conclusions of Law in this matter.

6.      The Debtor has established that a sound business purpose and judgment exists for this Court to authorize, pursuant to Section 363(b), a pre-confirmation sale of the Purchased Assets for the following reasons:

a.      The Debtor ceased business operation on or about December 16, 2011, and is unable to continue operation of the Liberty Denim Manufacturing Facility and is unable to file a feasible Plan of Reorganization for the operation of the same;

b.      Time is of the essence for the sale of the Purchased Assets. Continued delay of a sale of the Purchased Assets will act to further diminish the value that could ultimately be obtained for the Purchased Assets and there is a strong likelihood that substantial value will be lost.

c.      The Sale and Auction Procedures as hereinafter set forth will allow the Purchased Assets to be properly and adequately exposed to the marketplace, create an appropriate and fair competitive bidding process to allow for the marketplace to determine the

fair market value of the Purchased Assets to be sold and will allow for a timely sale of the Purchased Assets that preserves, to the best extent possible, the value of the Purchased Assets.

d.      The opening bid amount of $1,580,000.00, if ultimately the highest bid for the Purchased Assets, represents a fair market value derived in good faith and through arms length negotiations.

e.      The Breakup Fee of $50,000 as provided pursuant to Section 4.3 of the Asset Purchase Agreement is fair and reasonable, is based upon the Debtor's business judgment and will provide a benefit to this estate.

7.      Sound business judgment has been established for a sale of the Purchased Assets, and the Court is satisfied that a sound business purpose and judgment exists for this Court to authorize the sale of the Purchased Assets to be conducted pursuant to the terms of the Sale and Auction Procedures as set forth in the Asset Purchase Agreement and presented to this Court, except as hereinafter modified by this Order.

8.      The Sale and Auction Procedures approved by this Court and required to be employed in the sale of the Purchased Assets shall be as follows:

a.      Sale Means. The sale shall be by means of an absolute auction.

b.      Time and Date of Auction. The auction sale shall occur at the Final Sale Hearing as such term defined below.

c.      Acceptable Bidder. An Acceptable Bidder must be a party who attends the Final Sale Hearing and delivers to counsel for the Debtor a certified check made payable to the Debtor in the amount of $150,000.  The Debtor's attorney shall deposit said funds in a separate account maintained for all deposits received at the Debtor's designated depository. Debtor's attorney shall cause all deposits to be returned within two (2)

business days following the auction date. However, if prior to the sale an Acceptable

Bidder determines that it will not participate and requests a refund of its deposit, the

Debtor's attorney shall cause such Acceptable Bidder's deposit to be returned within two

(2) business days following said request. Deposits shall be returned by first-class mail to

the address and entity which the Acceptable Bidder in writing has instructed the attorney

for the Debtor to return the deposit. If an Acceptable Bidder desires that the deposit be

returned by wire transfer, then said instructions for such wire transfer shall be provided to

Debtor's attorney along with such Acceptable Bidder's request for a return of its deposit.

Failure of the Acceptable Bidder to provide proper instructions for the return of deposit

will authorize Debtor's attorney to hold said deposit pending written instructions.

d.    Acceptable Bidder Dispute Resolution. At the Final Sale Hearing, the

Bankruptcy Court shall resolve any disputes which may exist between a Prospective

Upset Bidder and the Debtor or the Committee as to whether said Prospective Upset

Bidder should be designated an Acceptable Bidder.

e.    Acceptable Opening Bid. The opening acceptable bid shall be deemed to

be made by the Purchaser upon the terms and conditions set forth in the Asset Purchase

Agreement.

f.    Acceptable Upset Bids. An Acceptable Upset Bid may be made by

an Acceptable Bidder. The first Acceptable Upset Bid made after the Acceptable Opening

Bid must be in an amount equal to or greater than $100,000 in excess of the Acceptable

Opening Bid of $1,580,000.00. Thereafter, Acceptable Upset Bids must exceed the previous

Acceptable Upset Bid by an amount equal to or greater than $50,000. An Acceptable Upset

Bid must be a bid to purchase all of the Purchased Assets under the terms and conditions set forth in the Asset Purchase Agreement as approved except to the extent the same is modified by the terms of this Order. (Such upset bid shall hereinafter be referred to as an "Acceptable Upset Bid.") (The ultimate highest bidder shall be referred to herein as the "Highest Bidder.")

g.  Method for Submitting an Acceptable Upset Bid. To be considered a valid Acceptable Upset Bid, the following is required:

(1)  The Upset Bid shall be made by a person who satisfies the conditions set forth the approved Sale and Auction Procedures included in the Notice of Sale, attached hereto as **Exhibit 1**, to qualify as an Acceptable Bidder. The Purchaser is deemed to qualify as an Acceptable Bidder and shall be deemed to qualify as such for all purposes of participating in the Auction;

(2)  The Acceptable Upset Bid made by the Highest Bidder shall remain open and be irrevocable through the Final Sale Hearing and, if it is determined at such hearing to be approved as the final Acceptable Bid, it shall remain open and be irrevocable through the date of closing;

(3)  Upon being deemed the Highest Bidder at the auction sale, the Highest Bidder shall execute the Asset Purchase Agreement subject to such changes as may be approved at the Final Sale Hearing.

(4)  The bid of the Highest Bidder is not subject to any upset bid after the close of the Final Sale Hearing.

h.      Procedures if No Acceptable Upset Bid is Received. If no
Acceptable Upset Bid is received, then the bid of the Purchaser as set forth in the Asset
Purchase Agreement in the amount of $1,580,000.00 shall be deemed the highest bid for
the Purchased Assets and shall therefore be submitted for approval by the Court at the
Final Sale Hearing.

i.      Back-Up Bidder.  The Highest Bidder(s) shall be required to consummate the
purchase of the Purchased Assets by the Closing Date as defined below.  If the Highest Bidder(s) fails
to timely consummate the purchase of the Purchased Assets, or any part thereof, then the Debtor shall
be authorized,  but not required, subject to Committee approval,  to consummate the sale of the Assets
to the Acceptable Bidder that submitted the next highest and best bid as determined by the Debtor and
the Committee (the "Back-Up Bid") pursuant to the terms of such Back-Up Bid (the "Back-Up
Bidder") the day immediately following the Closing Date.   If the Highest Bidder(s) fails to
consummate the purchase of the Assets because of a breach, default, or failure to perform on the part
of such Highest Bidder, the Debtor reserves the right to seek all available damages from such Highest
Bidder.

j.      Final Sale Hearing. A final sale hearing (the "Final Sale Hearing") shall be
held at **2:00 p.m., on June 12, 2012,** in the United States Bankruptcy Court, Donald S.
Russell Courthouse, 201 Magnolia Street, Spartanburg, South Carolina 29306. It shall be the
purpose of the hearing to conduct the Auction, to resolve any dispute regarding whether a
bidder is an Acceptable Bidder, and to make such findings as are necessary to provide the
Purchaser (or Highest Bidder as the case may be) with an order that properly passes title in
accordance with the terms and conditions of the Asset Purchase Agreement and this Order.

The Final Sale Hearing may be continued, adjourned, or rescheduled without any further notice by an announcement of the adjourned date at the Final Sale Hearing.

k.    Closing Date. The closing date shall be deemed to be the date upon which the consideration is paid and all closing documents are signed. This may take place immediately after the Final Sale Hearing but must occur within ten (10) days of the entry of the Order approving the sale which is obtained as a result of the Final Sale Hearing.

l.    Absolute Sale. This auction shall be an absolute sale and is not subject to upset bid after the auction is concluded. Cause exists, pursuant to Bankruptcy Rule 6004(h), to authorize the Debtor to close this sale immediately upon entry of the order approving the sale following the Final Sale Hearing. Accordingly, the 14 day automatic stay under Rule 6004(h) shall not apply to this order and all parties hereto have further requested that the Court include such a finding in the order approving the sale to the Highest Bidder to be entered after the Final Sale Hearing.

m.    Assets Being Sold. The assets being sold, described as Purchased Assets, are those assets and only those assets as described in the Asset Purchase Agreement.

16.    Except as specifically modified herein, the terms and conditions of the sale of the Purchased Assets shall be the same terms and conditions as set out and specifically stated in the Asset Purchase Agreement.

17.    The Debtor has identified a number of secured creditors who assert liens on or security interests in certain of the Debtor's Assets. The Debtor seeks to sell the Purchased Assets free a clear of such claims, liens and interests and have such claims, liens or interests attach to the proceeds of sale pursuant to Section 363(f)(2). Absent any objection to the Sale, the liens, claims,

8

interests and encumbrances of the following parties upon the Purchased Assets shall be transferred to the proceeds of sale pursuant to Section 363(f):

    a).    Wells Fargo Bank, N.A. f/k/a Wells Fargo Business Credit, Inc.

    b).    Atkins Machinery, Inc.

    c).    B&D Marine and Industrial Boilers, Inc.

    d).    Pickens County, South Carolina Tax Assessor

Based upon a UCC search, the Debtor is aware that Parkdale America, LLC and/or Parkdale Mills, Inc. (collectively "Parkdale") may have a security interest on certain inventory, however Parkdale has not filed a proof of claim or otherwise asserted any such interest in this case.  Under the terms of the APA, the Debtor will not be selling any of its inventory, and therefore, no proceeds of the Sale will be paid to Parkdale on account of any secured claim it may have against the Debtor.

The above parties shall have no right to credit bid at the sale pursuant to 11 U.S.C. § 363(k), or as might be authorized by any applicable law.

By this Order, the Court is not making any finding as to the validity, priority, or amount of any of the foregoing claims and all parties reserve their rights to object to such claims or to seek to avoid or otherwise challenge the validity, priority or extent of any claims, liens or security interests of such secured creditors or any other creditor.

18.    To ensure that Prospective Upset Bidders and the Highest Bidder obtain marketable title and that appropriate due process has been given to creditors, the Debtor or the Committee shall serve the attached Notice of Sale by first-class mail, within three (3) business

days after entry of this Order on: (a) all potential purchasers with whom the Debtor or the

Committee have communicated about the sale of the assets; (b) all attorneys and other parties

who have entered an appearance in this case; and (c) all secured creditors, applicable taxing

authorities, the United States Trustee, and the top twenty (20) unsecured creditors and file a

Certificate of Service of the same with the Court.

Based upon the foregoing **FINDINGS OF FACT AND CONCLUSIONS OF
LAW**:

**IT IS, THEREFORE, ORDERED, ADJUDGED and DECREED** and **NOTICE IS
HEREBY GIVEN** as follows:

The Debtor is authorized to sell the Purchased Assets on the terms and conditions as set

forth herein and pursuant to the Sale and Auction Procedures as set out herein;

1.      The sale of the Purchased Assets shall be free and clear of all liens, claims,

encumbrances and other claims of interest with such liens, claims, encumbrances and other

claims of interest as identified herein being transferred to the proceeds of sale;

2.      The Purchaser is deemed to be an Acceptable Bidder;

3.      The Break Up Fee of $50,000 as set forth in the Sale and Procedures Motion is

approved.   In consideration of the approval of the Break Up Fee, the Purchaser shall be required

to share its due diligence with any interested party upon request that may aid in determination of

the nature or condition of the Debtor's Assets.   In no event shall Purchaser be required to share

or disclose any sensitive market information it has obtained or developed related to the Debtor's

Assets.

4.      The form of the Notice of (A) The Proposed Sale of Substantially All Assets of

the Debtor Free and Clear of All Liens, Claims, Encumbrances and Other Interests; (B) Bidding

Procedures, Auction, and Final Sale Hearing and (C) Deadline to Object to Sale attached hereto as **Exhibit 1** (the "Notice of Sale") is hereby approved.   The Debtor or the Committee shall cause the Notice of Sale to be served by first class mail on the persons identified in Paragraph 18, above, within three (3) days of entry of this Order;

5.   The Sale and Auction Procedures included as Exhibit A in the attached Notice of Sale are approved;

6.   A copy of the Asset Purchase Agreement and any other relevant documents shall be served on all interested parties along with the Notice of Sale.

7.   The Final Sale Hearing as outlined herein shall take place **at 2:00 p.m., on June 12, 2012** at which time the Auction shall be conducted, the Court will resolve any disputes regarding who may be an Acceptable Bidder, and the Court will confirm approval of the sale to Purchaser or the Highest Bidder if someone other than Purchaser.   Any objection to the sale must be filed with the Clerk of the Bankruptcy Court and served on all parties in interest no later than **June 5, 2012.**

8.   This Order supersedes the Order Setting Final Sale Hearing entered on April 25, 2012 [Docket No. 54] with respect to the scheduling of the Final Sale Hearing and deadline for objections, and the Clerk is hereby authorized and directed to edit the docket with respect to such order [Docket No. 54] to so indicate.

 IT IS SO ORDERED.

**EXHIBIT 1 of 1**

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 11-08066-hb |
| LIBERTY DENIM, LLC, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | |

**NOTICE OF (A) THE PROPOSED SALE OF SUBSTANTIALLY ALL ASSETS OF THE DEBTOR FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS; (B) BIDDING PROCEDURES, AUCTION, AND HEARING ON THE SALE; (C) DEADLINE TO OBJECT TO SALE**

**TO:  ALL CREDITORS AND PARTIES IN INTEREST**

     **YOU ARE HEREBY NOTIFIED** that the Debtor and the Official Committee of Unsecured Creditors are applying for approval to sell substantially all of the property of the Debtor's estate described below free and clear of all liens and encumbrances according to the terms and conditions stated in the Joint Motion by the Debtor and the Official Committee of Unsecured Creditors for an Orders Pursuant to Section 105(a) and 363 of the Bankruptcy Code (A) Authorizing and Scheduling an Auction at Which the Debtor Will Solicit Bids for the Sale of its Assets; (B) Approving Procedures for Submission of Competing Bids; (C) Approving Breakup Fee Provisions; (D) Scheduling a Hearing to Conduct Such Sale; (E) Approving the Form and Manner of Notice of Auction Procedures and Sale Hearing; (F) Authorizing the Sale of the Assets to Real Estate Diversified, LLC, or the Highest Bidder at Auction; (G) Authorizing the Sale of the Asset to Be Free and Clear of All Liens, Claims, Encumbrances and Other Claim of Interest and Transferring Such Claims to the Proceeds of Sale; (H) Approving the Form of Asset Purchase Agreement; and (i) Granting Related Relief filed with the Court on April 24, 2012 (the "Sale Motion").

     **TAKE FURTHER NOTICE** that any response, return, and/or objection to the Sale Motion should be filed with the Clerk of the Bankruptcy Court no later than **June 5, 2012** and a copy simultaneously served on all parties in interest.

     **TAKE FURTHER NOTICE** that a hearing (the "Final Sale Hearing") will be held on the Sale Motion on **June 12, 2012 at 2:00 p.m** at the United States Bankruptcy Court, Donald S. Russell Courthouse, 201 Magnolia Street, Spartanburg, South Carolina, 29306 (the "Sale Hearing").  No further notice of the Final Sale Hearing will be given and the Final Sale Hearing may be adjourned at any time and from time to time without further notice.

**TAKE FURTHER NOTICE** that an Auction will be held for the sale of substantially all of the Assets of the Debtor as set forth in the Sale and Auction Procedures attached hereto as **Exhibit A** and incorporated herein, at the Final Sale Hearing. No further notice of the Auction will be given and the Auction may be adjourned at any time and from time to time without further notice.

**TYPE OF SALE:** Public Auction subject to the Sale and Auction Procedures approved by the Bankruptcy Court attached hereto as **Exhibit A.**

**PROPERTY TO BE SOLD:** All of Debtor's right, title, and interest in substantially all assets and properties, real or personal, tangible or intangible, as defined in the stalking horse asset purchase agreement (the "APA") attached hereto as **Exhibit B**, including but not limited to:

1. All of the real property commonly known as 500 Maplecroft Street, City of Liberty, County of Pickens, State of South Carolina 29657, Parcel Number (TMS) 4087-12-85-7244, and consisting of approximately 7.33 acres as set forth in the plat entitled "Survey and Certification for Liberty Denim, LLC" prepared by John F. Tinsley, PLS # 16824 dated November 24, 2008 and recorded December 12, 2008 in Plat Book 593, Page 84 in the Office of the Register of Deeds for Pickens County, South Carolina;

2. All of the real property identified as Vacant Lot Nos. 5, 6, and 7 on the East Side of West Beattie Street, City of Liberty, County of Pickens, State of South Carolina 29657, Parcel No. (TMS) 4097-06-27-8793, and consisting of approximately 0.42 acres as set forth in the plat entitled "Survey and Certification for Liberty Denim, LLC" prepared by John F. Tinsley, PLS # 16824 dated September 8, 2008 and recorded December 12, 2008 in Plat Book 593, Page 81 in the Office of the Register for Pickens County, South Carolina;

3. All of the real property commonly known as 17 East Beattie Street, City of Liberty, County of Pickens, State of South Carolina 29657, Parcel No. (TMS) 4097-10-46-1554, and consisting of approximately 19.56 acres as set forth in the plat entitled "Survey and Certification for Liberty Denim, LLC" prepared by John F. Tinsley, PLS # 16824 dated September 8, 2008 and recorded December 12, 2008 in Plat Book 593, Page 87 in the Office of the Register of Deeds for Pickens County, South Carolina and the plat entitled "Survey and Certification for Liberty Denim, LLC" prepared by John F. Tinsley, PLS # 16824 dated September 8, 2008 and recorded December 12, 2008 in Plat Book 593, Page 86 in the Register of Deeds Office for Pickens County, South Carolina; ;

4. All of the real property commonly known as 101 Mills Avenue, City of Liberty, County of Pickens, South Carolina 29657 consisting of approximately 5.56 acres as set forth in the plat entitled "Survey and Certification for Liberty Denim, LLC" prepared by John F. Tinsley, PLS # 16824 dated September 8, 2008 and recorded December 12, 2008 in Plat Book 593, Page 89 in the Office of the Register of Deeds for Pickens County, South Carolina; and

5. All equipment, machinery, supplies, commercial customer data and information, real property, software, intellectual property, books, records, goods and vehicles and any other assets of the Debtor not designated as an Excluded Asset in the APA or the Sale Motion.

**SALES PRICE:**  $1,580,000 [as set forth in the APA]

**ANY PARTY MAY MAKE A COMPETING BID; HOWEVER, ALL BIDS MUST BE AN ACCEPTABLE BID AND BE MADE PURSUANT TO THE SALE AND AUCTION PROCEDURES AS SET FORTH IN <u>EXHIBIT A</u> ATTACHED HERETO**

**APPRAISED VALUE:**  Not Applicable.

**BUYER:**  Real Estate Diversified, LLC as set forth in the APA filed with the Court, or the Highest Bidder at the Auction to be held in accordance with the Sale and Auction Procedures. Real Estate Diversified, LLC has no relationship with the Debtor or its principals and is not an "insider" of the Debtor as such term is defined in 11 U.S.C. § 101(31).

**PLACE AND TIME OF SALE:**  See above.

**SALES AGENT/AUCTIONEER/BROKER:**  Not applicable.

**COMPENSATION TO SALES AGENT/AUCTIONEER/BROKER:**  Not applicable.

**ESTIMATED TRUSTEE'S COMMISSION ON SALE:**  None.

**LIENS/MORTGAGES/SECURITY    INTEREST    ENCUMBERING    PROPERTY**: (A) Atkins Machinery, Inc., in the approximate amount of $605,124.51, secured by liens on substantially all of the Assets; (B) Wells Fargo Bank, N.A. f/k/a Wells Fargo Business Credit, Inc., in the approximate principal amount of $748,926.26, secured by a lien on substantially all of the personal property Assets; (C)  B&D Marine and Industrial Boilers, Inc. holds a recorded mechanic's lien on certain of the Debtor's real property in the amount of $37,063.15; (E) Pickens County, South Carolina Tax Assessor for outstanding 2011 real property taxes in the approximate amount of $36,779.23.  Nothing the Sale Motion or this Notice is intended as an admission as to the validity, enforceability, extent, or priority of any lien or security interest on or in any of the Debtor's assets, and all claims, rights or defenses of any party, including without limitation the Debtor and the Committee, are expressly preserved.

Based upon a UCC search, the Debtor is aware that Parkdale America, LLC and/or Parkdale Mills, Inc. (collectively "Parkdale") may have a security interest in certain inventory, however Parkdale has not filed a proof of claim or otherwise asserted any such interest in this case.  Under the terms of the APA, the Debtor will not be selling any of its inventory, and therefore, no proceeds of the Sale will be paid to Parkdale on account of any secured claim it may have against the Debtor.

This Notice does not constitute an admission regarding the validity, priority or extent of any claim, lien or security interest of any creditor and all rights of the Committee or any other party in interest to challenge the validity, priority or extent of any claim or lien asserted against the Debtor's estate or assets by any creditor in this case are expressly reserved.  Furthermore, no purchase price allocation among the Purchased Assets by Purchaser for tax purposes under

Section 12.3 of the Asset Purchase Agreement shall be binding or controlling as to any purchase price allocation regarding encumbered and unencumbered Purchased Asset

**DEBTORS EXEMPTIONS:**  None.

**PROCEEDS ESTIMATED TO BE PAID TO ESTATE:**  At this time the Debtor and the Committee believe based on the present Purchase Price that the Sale will generate proceeds sufficient to pay all allowed claims of secured creditors in full and to pay some or all administrative expense claims.   The amount of the Sale proceeds available to fund a distribution to unsecured creditors in this case is uncertain and depends on the extent to which the proceeds will have to be used to pay the secured claim of Wells Fargo Bank, N.A.. ("Wells Fargo"), to the extent its secured claim is allowed.  No proceeds of the Sale will be distributed to any creditor except as authorized pursuant to further order of the Court.

**SALE AND AUCTION PROCEDURES:  SEE <u>EXHIBIT A</u> ATTACHED HERETO.**

**STAY OF ORDER:** The Debtor and the Committee request that the Bankruptcy Court order and direct that any order or orders approving the Sale Motion shall <u>not</u> be automatically stayed for fourteen (14) days under Rule 6004(h) of the Federal Rules of Bankruptcy Procedure.

The Debtor and the Committee are informed and believe that it would be in the best interest of the estate to sell the assets pursuant to the terms of the APA, subject to higher and better bids and the Auction proposed herein.  The Debtor and the Committee also believe that the funds to be recovered for the estate from the sale of said property justify its sale and the filing of this application.

WHEREFORE, the Debtor and the Committee request the Court issue an order authorizing the sale of said property and such other and further relief as may be proper.

Dated:  May  _____, 2012

_____
Randy A. Skinner, Federal I.D. No. 5412
SKINNER LAW FIRM, LLC
Post Office Box 1843
Greenville, South Carolina  29602
Telephone:  (864) 232-2007
Facsimile:  (864)  232-8496
E-mail:  main@skinnerlawfirm.com

*Counsel for the Debtor*

and

_____

Steven A. Meckler (SC Bar # 68402)
David H. Conaway (pro hac vice)
David A. Matthews (pro hac vice)
SHUMAKER, LOOP & KENDRICK, LLP
128 South Tryon Street, Suite 1800
Charlotte, North Carolina 28202
Telephone:  (704) 375-0057
Facsimile:  (704) 332-1197
E-mail:  smeckler@slk-law.com
         dmatthews@slk-law.com
         dconaway@slk-law.com

*Counsel for the Unsecured Creditors' Committee*

## <u>EXHIBIT A</u>

## SALE AND AUCTION
## PROCEDURES

Set forth below are the auction procedures (the "<u>Auction Procedures</u>") to be employed in connection with the proposed sale of substantially all of the Purchased Assets (as defined below) of Liberty Denim, LLC, as debtor and debtor in possession (the "<u>Debtor</u>").  Pursuant to the Sale and Auction Procedures, the Debtor and the Unsecured Creditors' Committee (the "<u>Committee</u>") shall solicit bids for the purchase of the Purchased Assets, conduct an auction for the Purchased Assets (the "<u>Auction</u>") at the <u>Final Sale Hearing</u> (defined below) after which they will seek entry of an order (the "<u>Final Sale Order</u>") authorizing and approving the sale of the Purchased Assets to the Stalking Horse Bidder (as defined below) or the Highest Bidder(s) (as defined below).

A.      <u>Assets to be Sold</u>.

The Assets to be sold are the Purchased Assets as described in the attached Asset Purchase Agreement by and between the Debtor and Real Estate Diversified, LLC (the "<u>Stalking Horse Bidder</u>") for the Purchase Price in the amount of $1,580,000.00.

The Debtor seeks to sell substantially all of its assets (except for the "Excluded Assets" which are defined below), including without limitation, all equipment, machinery, supplies, commercial customer data and information, real property, software, intellectual property, books, records, goods, vehicles, customer lists, and the goodwill associated with the business (such assets, the "<u>Purchased Assets</u>").

**B.**     <u>Manner and Other Terms of Sale.</u>

The Purchased Assets shall be sold by absolute auction pursuant to the Auction procedures set forth herein, free and clear of any claims of lien, encumbrances or other claims of interest with said claims being transferred to the proceeds of sale. <u>As a result of the claims of lien being transferred to proceeds of sale, the parties holding secured claims shall not have rights to credit bid at this Sale as would be authorized under 11 U.S.C. § 363(k) or as might otherwise be authorized by any applicable law</u>.

The Purchased Assets will not include the "Excluded Assets" as defined in the Sale Motion and the Asset Purchase Agreement.  No purchase price allocation among the Purchased Assets by the Stalking Horse Bidder or Highest Bidder for tax purposes under Section 12.3 of the Asset Purchase Agreement shall be binding or controlling as to any purchase price allocation regarding encumbered and unencumbered Purchased Assets.

<u>No Debt Assumption.</u> No assumption of debt is associated with the sale contemplated herein.

<u>**No Representations or Warranties.**</u> **The Purchased Assets are being sold "as is" and "where is" and the Stalking Horse Bidder, or any ultimate Highest Bidder, is deemed to acknowledge and agree that, except as otherwise expressly provided in the Asset Purchase Agreement, neither the Debtor nor the Committee make any representations or warranties whatsoever, express or implied, with respect to any matter or condition relating to the Purchased Assets. This includes any representation as to the merchantability or fitness of the Purchased Assets for any particular purpose. Without in any way limiting the foregoing, the Debtor and the Committee hereby disclaim any warranty, expressed or implied, of merchantability or fitness for any particular purpose as to any portion of the**

**Purchased Assets relating to the title (other than as may be set forth in Article 2 of the Asset Purchase Agreement) possession, quiet enjoyment or any physical, environmental, health or safety conditions existing in, on at, or relating to the Purchased Assets. The Purchaser and/or any ultimate Highest Bidder further acknowledges that said party has conducted an independent inspection and investigation of the physical condition of the Purchased Assets and all such matters relating to or affecting the Purchased Assets as said party deems necessary or appropriate to the extent that they desire such. Purchaser or the Highest Bidder will accept the Purchased Assets at Closing "as is" and "where is."**

      **C.**     **The Auction.**

      <u>A.</u>    <u>Time and Date of Auction.</u> The Auction sale of the Purchased Assets shall take place at the Final Sale Hearing to occur **at 2:00 p.m. on June 12, 2012** at the United States Bankruptcy Court, Donald S. Russell Courthouse, 201 Magnolia Street, Spartanburg, South Carolina 29306.

      <u>B.</u>    <u>Acceptable Bidder.</u> Bids for the Purchased Assets will only be considered from an Acceptable Bidder that has made an Acceptable Upset Bid (as defined below). An Acceptable Bidder is a party who attends the Final Sale Hearing and at or before the Final Sale Hearing provides counsel for the Debtor a certified check in the amount of $150,000 made payable to Liberty Denim, LLC. The Debtor's attorney shall deposit said funds in a separate account maintained for all deposits received at the Debtor's designated depository. Debtor's attorney shall cause all deposits to be returned within two (2) business days following the auction date. The deposit shall be returned by first-class mail to the address and entity which the Acceptable Bidder in writing has instructed the attorney for the Debtor to return the deposit. If an Acceptable Bidder desires that the deposit be returned by wire transfer, then said instructions for said wire transfer shall be provided to Debtor's attorney upon submission of the deposit. Failure of the Acceptable Bidder to provide proper instructions for the return of deposit will authorize Debtor's attorney to hold said deposit pending written instructions.

C.    Acceptable Opening Bid. The opening acceptable bid shall be deemed to be made by the Stalking Horse Bidder upon the terms and conditions set forth in the Asset Purchase Agreement.

D.    Acceptable Upset Bids. An Acceptable Upset Bid may be made by an Acceptable Bidder. The first Acceptable Upset Bid made after the Acceptable Opening Bid must be in an amount equal to or greater than $100,000.00 in excess of the Acceptable Opening Bid of $1,580,000.00. Thereafter, Acceptable Upset Bids must exceed the previous Acceptable Upset Bid by an amount equal to or greater than $50,000. An Acceptable Upset Bid must be a bid to purchase all of the Purchased Assets under the terms and conditions set forth in the Asset Purchase Agreement as approved by the Court. (Such upset bid shall hereinafter be referred to as "Acceptable Upset Bid.") (The ultimate highest bidder shall be referred to herein as the "Highest Bidder.")  The Stalking Horse Bidder will not be allowed to credit bid the amount of the Breakup Fee against the Purchase Price.

**No Financing Contingency.** An Acceptable Upset Bid must contain no financing contingency.  The sale contemplated herein is not subject to the Stalking Horse Bidder's ability to obtain financing or for any higher bidder to obtain financing.

**No Due Diligence Contingency.**  An Acceptable Upset Bid must contain no due diligence contingency.  The sale contemplated herein is not subject to the Stalking Horse Bidder's completion of due diligence or for any higher bidder's completion of due diligence.

E.    Acceptable Bidder Dispute Resolution. At the Final Sale Hearing, the Bankruptcy Court shall resolve any dispute which may exist between a Prospective Upset Bidder and the Debtor and the Committee as to whether said Prospective Upset Bidder should be designated an Acceptable Bidder.

F.    How to Make Upset Bid. To be considered a valid Acceptable Upset Bid, the following is required:

(1)    The Upset Bid shall be made by a person or persons who satisfies the conditions set forth above to qualify as an Acceptable Bidder. The Stalking

Horse Bidder is deemed to qualify as an Acceptable Bidder and shall be deemed to qualify as such for all purposes of participating in the Auction;

(2)     The Acceptable Upset Bid made by the Highest Bidder shall remain open and be irrevocable through the conclusion of Final Sale Hearing and, if it is determined at such hearing to be approved as the final Acceptable Bid, it shall remain open and be irrevocable through the date of closing;

(3)     Upon being deemed the Highest Bidder at the auction sale, said Acceptable Bidder shall execute the Asset Purchase Agreement and a representation and agreement that its highest bid has been submitted pursuant to the terms and conditions of the Sale and Auction Procedures Order, and that said terms and conditions of the Asset Purchase Agreement are agreed to.

(4)     The Acceptable Upset Bid or Bid of the Highest Bidder is not subject to any upset bid after the close of the absolute auction or at the Final Sale Hearing.

G.     Procedures if No Acceptable Upset Bid is Received. If no Acceptable Upset Bid is received, then the Asset Purchase Agreement bid by the Stalking Horse Bidder in the amount of $1,580,000.00 shall be deemed the highest and best offer for the Purchased Assets and shall therefore be submitted for approval by the Court at the Final Sale Hearing.

H.     Back-Up Bidder.   The Highest Bidder(s) shall be required to consummate the purchase of the Purchased Assets by the Closing Date as defined below.  If the Highest Bidder(s) fails to timely consummate the purchase of the Purchased Assets, or any part thereof, then the Debtor shall be authorized,  but not required, subject to Committee approval,  to consummate the sale of the Assets to the Acceptable Bidder that submitted the next highest and best bid as determined by the Debtor and the Committee (the "Back-Up Bid") pursuant to the terms of such Back-Up Bid (the "Back-Up Bidder") the day immediately following the Closing Date.  If the Highest Bidder(s) fails to consummate the purchase of the Assets because of a breach, default, or failure to perform on the part of such

Highest Bidder, the Debtor reserves the right to seek all available damages from such Highest Bidder.

I.      Final Sale Hearing. The purpose of the Final Sale Hearing shall be to conduct the auction in accordance with these Sale and Auction Procedures and resolve any disputes related thereto, including whether a party should be designated as an Acceptable Bidder, and to make such findings as are necessary to provide the Stalking Horse Bidder (or the Highest Bidder) with an order that properly passes title in accordance with the terms and conditions of the Asset Purchase Agreement and the order approving same. The Final Sale Hearing may be continued, adjourned, or rescheduled without any further notice by an announcement of the adjourned date at the Final Sale Hearing.

J.      Closing.   As soon as practicable following notification of the determination of the Highest Bid, the Highest Bidder must execute an amendment to its proposed asset purchase agreement reflecting any modifications agreed to by the Debtor and the Committee and the Highest Bidder at Auction, which Asset Purchase Agreement shall be in all respects acceptable to the Debtor and the Committee. A closing shall take place on the date of auction or within ten (10) days thereafter, or at such other place and time as the purchaser and Seller may agree.

K.     Closing Date. The closing date shall be deemed to be the date upon which the consideration is paid and all closing documents are signed. This may take place immediately after the Final Sale Hearing but must occur within ten (10) days of the Final Sale Hearing.

L.    Court Approval. The sale contemplated herein is subject to Court approval of the requested terms of the Asset Purchase Agreement.

**D.    Break-Up Fee and Expense Reimbursement.**

As set forth in Section 4.3 of the Asset Purchase Agreement, the Stalking Horse Bidder shall be entitled to a Break-Up Fee of $50,000 in consideration of its substantial fees, costs, and expenses (including, without limitation, incurred attorneys' fees, other professional fees, and lender fees) incurred in connection with the negotiation and performance of the Asset Purchase Agreement and the transactions contemplated thereby.  The Break-Up Fee shall be due and payable pursuant to the terms set forth in Section 4.3 of the Asset Purchase Agreement.  Notwithstanding any language in the Asset Purchase Agreement to the contrary: (i) the Break-Up Fee shall only be payable if an Alternative Transaction (as defined in Section 4.3 of the APA) closes, and in such case, the Break-Up Fee shall be paid at Closing from sales proceeds; and (ii) the Break-Up Fee shall be an allowed administrative claim. When bidding at the Auction, the Stalking Horse Bidder shall not receive a cash "credit" in the amount of the Break-Up Fee.

In consideration of the approval of the Break Up Fee, the Purchaser shall be required to share its due diligence with any interested party upon request that may aid in determination of the nature or condition of the Debtor's Assets.  In no event shall Purchaser be required to share or disclose any sensitive market information it has obtained or developed related to the Debtor's Assets.   In order to arrange access to Purchaser's due diligence, interested parties should contact counsel for the Purchaser, Frank B.B. Knowlton, Nelson, Mullins Riley & Scarborough, LLP Meridian, 17th Floor

1320 Main Street, Columbia, SC 29201 Tel: (803) 255-9588; e-mail: frank.knowlton@nelsonmullins.com.

**E.**     **Reservation of Rights.**

The Debtor and the Committee reserve the right to determine in their reasonable discretion whether any Acceptable Upset Bid is the highest and best Bid subject to any expenses, limitations, or conditions contained in these Sale and Auction Procedures or Orders of the Court. The Debtor and the Committee also reserve the right to modify the Auction Procedures without the need for any further order of the Bankruptcy Court, including, without limitation, (i) extending the deadlines set forth in the Auction Procedures, (ii) adjourning the Auction, (iii) withdrawing any Assets from the sale process at any time prior to or during the Auction, provided that any such modification is not inconsistent with the Asset Purchase Agreement or the order of the Bankruptcy Court approving these Auction and Sale Procedures.

**ASSET PURCHASE AGREEMENT**

**BY AND BETWEEN**

**LIBERTY DENIM, LLC**

**(SELLER)**

**AND**

**REAL ESTATE DIVERSIFIED, LLC**
**(BUYER)**

**DATED AS OF**

**April __, 2012**

# TABLE OF CONTENTS

**Page**

ARTICLE 1      PURCHASE AND SALE OF ASSETS.................................................1
   Section 1.1     Transfer of Assets ......................................................................1
   Section 1.2     Purchased Assets ........................................................................2
   Section 1.3     Excluded Assets ..................................  ..........................3
   Section 1.4     Liabilities....................................................................................3
   Section 1.5     Purchase Price ............................................................................3
ARTICLE 2      REPRESENTATIONS AND WARRANTIES
                 CONCERNING   SELLER ................................. 4
   Section 2.1     Organization and Good Standing ............................... 4
   Section 2.2     Authority .................................................................... 4
   Section 2.3     No Conflict or Breach ................................................ 4
   Section 2.4     Books and Records ..................................................... 5
   Section 2.5     Title to Assets; Liens................................................. 5
   Section 2.6     Real Property.............................................................. 5
   Section 2.7     Tangible Personal Property ........................................ 5
   Section 2.8     Intellectual Property .................................................. 5
   Section 2.9     Brokers ....................................................................... 6
   Section 2.10    Bulk Sale Act ............................................................ 6
   Section 2.11    Secured Transactions Laws........................................ 6
ARTICLE 3      REPRESENTATIONS AND WARRANTIES OF BUYER ...................... 6
   Section 3.1     Organization and Good Standing ............................... 6
   Section 3.2     Authority .................................................................... 6
   Section 3.3     No Conflict or Breach ................................................ 7
   Section 3.4     Financial Capability of Buyer ................................... 7
   Section 3.5     No Other Representations ........................................... 7
   Section 3.6     Brokers ....................................................................... 7
   Section 3.7     Resale ......................................................................... 7
ARTICLE 4      COVENANTS OF SELLERS.................................................. 8
   Section 4.1     Conduct of Business................................................... 8
   Section 4.2     Required Consents ...................................................... 8
   Section 4.3     Break-Up Fee ............................................................. 8
ARTICLE 5      MUTUAL COVENANTS ....................................................... 8
   Section 5.1     Cooperation ................................................................ 8
   Section 5.2     Confidentiality............................................................ 8
ARTICLE 6      CONDITIONS PRECEDENT TO BUYER'S OBLIGATIONS............. 9
   Section 6.1     Representations and Warranties ................................. 9
   Section 6.2     Compliance with Covenants ...................................... 9
   Section 6.3     Bankruptcy Court Approval; Consents and Approvals........................... 9
   Section 6.4     Removal of Liens ....................................................... 9
ARTICLE 7      CONDITIONS PRECEDENT TO SELLERS' OBLIGATIONS .......... 10
   Section 7.1     Representations and Warranties ............................... 10
   Section 7.2     Compliance with Covenants .................................... 10
   Section 7.3     Absence of Litigation .............................................. 10
   Section 7.4     Bankruptcy Court Approval; Consents and Approvals........................ 10
   Section 7.5     Payment of Certain Fees, Expenses, Costs, Taxes, Etc..................... 10
ARTICLE 8      CLOSING ........................................................................... 10
   Section 8.1     Closing ..................................................................... 10

Section 8.2      Deliveries by Seller ............................................................................ 10
Section 8.3      Deliveries by Buyer ............................................................................ 11
Section 8.4      Taxes ................................................................................................... 11
Section 8.5      Further Assurances .............................................................................. 11
ARTICLE 9       BANKRUPTCY COURT ACTION ..................................................... 11
Section 9.1      Bankruptcy Court Action ................................................................... 11
Section 9.2      Public Announcements ....................................................................... 12
Section 9.3      Notice of Sale ..................................................................................... 12
ARTICLE 10      TERMINATION ................................................................................... 13
Section 10.1     Termination ......................................................................................... 13
Section 10.2     Effect of Termination ......................................................................... 13
ARTICLE 11      INDEMNIFICATION ........................................................................... 13
Section 11.1     Indemnifications by Seller .................................................................. 13
Section 11.2     Indemnifications by Buyer .................................................................. 14
ARTICLE 12      MISCELLANEOUS .............................................................................. 14
Section 12.1     Expenses ............................................................................................. 14
Section 12.2     Risk of Loss ........................................................................................ 14
Section 12.3     Tax Filings .......................................................................................... 14
Section 12.4     Best Efforts ......................................................................................... 14
Section 12.5     Notices ................................................................................................ 14
Section 12.6     Counterparts ....................................................................................... 15
Section 12.7     Assignment ......................................................................................... 15
Section 12.8     Third Party Beneficiaries ................................................................... 16
Section 12.9     Name, Gender, and Headings ............................................................. 16
Section 12.10    Recitals ............................................................................................... 16
Section 12.11    Amendments ....................................................................................... 16
Section 12.12    Governing Law ................................................................................... 16
Section 12.13    Severability ......................................................................................... 16
Section 12.14    Entire Agreement ............................................................................... 16
Section 12.15    Construction ........................................................................................ 16
Section 12.16    Time of Essence ................................................................................. 16
Section 12.17    Knowledge .......................................................................................... 16
Section 12.18    Dispute Resolution; Payment of Court Costs and Fees ..................... 16

## INDEX OF DEFINITIONS

| **Defined Terms** | **Defined in** |
|---|---|
| Agreement | Introduction |
| Alternative Transaction | Section 4.3 |
| Approval Order | Section 9.1(b) |
| Bankruptcy Case | Second Recital |
| Bankruptcy Code | First Recital |
| Bankruptcy Court | First Recital |
| Bidding Procedures | Section 9.1(a) |
| Break-Up Fee | Section 4.3 |
| Bulk Sale Act | Section 2.10 |
| Business | Third Recital |
| Buyer | Introduction |
| Closing | Section 8.1 |
| Closing Date | Section 8.1 |
| Excluded Assets | Section 1.3 |
| HSR Act | Section 3.3 |
| Intellectual Property | Section 2.8 |
| Liabilities | Section 1.4 |
| Lien | Section 1.1 |
| Material Adverse Effect | Section 2.3 |
| Permits | Section 1.2(e) |
| Permitted Liens | Section 2.5 |
| Procedure Order | Section 9.1(a) |
| Purchased Assets | Section 1.2 |
| Purchase Price | Section 1.5 |
| Real Property | Section 1.2(a) |
| Representatives | Section 5.2 |
| Required Consents | Section 2.3 |
| Sale Motion | Section 9.1(b) |
| Secured Transactions Law | Section 2.11 |
| Seller | Introduction |
| Seller's Petition Date | Second Recital |
| Service Agreements | Section 1.2(g) |
| Tangible Property | Section 1.2(b) |
| Transferred Intellectual Property | Section 2.8 |

## **SCHEDULES**

| | |
|---|---|
| Schedule 1.2(a) | Real Property |
| Schedule 1.2(b) | Tangible Property |
| Schedule 1.3(a) | Excluded Assets |
| Schedule 2.3 | Required Consents |
| Schedule 2.5(d)(i) | Liens to be Removed at Closing |
| Schedule 2.5(d)(ii) | Permitted Liens |
| Schedule 12.3 | Tax Allocation of Purchase Price |

## **EXHIBITS**

| | |
|---|---|
| Exhibit A | Purchased Assets |
| Exhibit B | Bidding Procedures |

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (together with all Schedules and Exhibits, this "Agreement"), dated as of April \_\_, 2012, is entered into by and between Liberty Denim, LLC, a South Carolina limited liability company operating as a debtor-in-possession under Chapter 11 of the United States Bankruptcy Code ("Seller"), and Real Estate Diversified, LLC, an Alabama limited liability company ("Buyer").

## RECITALS

1. On or about December 31, 2011, an involuntary petition was filed against Seller, pursuant to Chapter 7 of the United States Bankruptcy Code (11 U.S.C. §§ 101 et seq.), as amended (the "Bankruptcy Code"), with the United States Bankruptcy Court for the District of South Carolina (the "Bankruptcy Court").

2. On February 13, 2007 (the "Seller's Petition Date"), Seller filed a motion with the Bankruptcy Court to convert the bankruptcy proceedings to a Chapter 11 proceeding pursuant to the Bankruptcy Code with Debtor-in-Possession. The Bankruptcy Court subsequently converted the Chapter 7 case to a case under Chapter 11 of the Bankruptcy Code with Debtor-in-Possession. The bankruptcy case of Seller is referred to herein as the "Bankruptcy Case." Capitalized terms used in this Agreement that are not defined herein have the meanings ascribed thereto in the Bankruptcy Code to the extent defined therein.

3. Seller formerly manufactured denim (the "Business").

4. Subject to the Approval Order (as defined below in Section 9.1(b)) of the Bankruptcy Court, Seller desires to sell, and Buyer desires to buy, the Purchased Assets (as defined in Section 1.2 below) on the terms and conditions set forth in this Agreement.

**THEREFORE,** in consideration of the mutual covenants, representations, warranties and obligations contained in this Agreement, the parties, intending to be legally bound, agree as follows:

## ARTICLE 1
## PURCHASE AND SALE OF ASSETS

Section 1.1 <u>Transfer of Assets.</u> Subject to the terms and conditions of this Agreement, including, without limitation, the entry of the Approval Order, Seller shall sell, assign, transfer, and deliver to Buyer or such affiliate or affiliates of Buyer as are permitted under Section 12.7 of this Agreement and that are designated by Buyer, and Buyer shall purchase and accept from Seller, or cause such affiliate or affiliates to purchase and accept from Seller, as the case may be, at the Closing (as defined in Section 8.1 below), the Purchased Assets (as defined in Section 1.2 below), but excluding the Excluded Assets (as defined in Section 1.3 below). Such transfer of the Purchased Assets by Seller to Buyer shall be free and clear of all Liens (as defined in this Section 1.1 below), claims, interests, encumbrances, pension liabilities, successor liability claims, and other Liabilities (as defined in Section 1.4 below) and obligations, related thereto, of every kind or

description, to the fullest extent permitted by the Bankruptcy Code and applicable non-bankruptcy law, but excluding only Permitted Liens (as defined in Section 2.5 below). For purposes of this Agreement, "Lien" means any mortgage, pledge, lien, security interest, charge, claim, lien of taxes (other than taxes not yet due and payable), legal or equitable interest, encumbrance, restriction on transfer, conditional sale or other title retention device or arrangement, transfer for the purpose of subjection to the payment of any indebtedness, or restriction on creation of any of the foregoing, whether relating to any property or right or the income or profits therefrom.

Section 1.2 <u>Purchased Assets.</u> For purposes of this Agreement, "Purchased Assets" shall mean all of Seller's rights, title and interest in and to all of Seller's assets and properties of every kind and description and wherever located, more particularly described as Exhibit A attached hereto and excluding only the Excluded Assets set forth in Section 1.3.  The Purchased Assets include without limitation:

(a)    <u>Real Property.</u> Seller's ownership interests in the real property, buildings and improvements described on <u>Schedule 1.2(a)</u> (the "Real Property").

(b)    <u>Tangible Personal Property.</u> All machinery, equipment, furniture, office equipment, supplies, materials, vehicles, automobiles, trucks, trailers, tools, computers, printers, hardware, stored materials, works-in-progress, consumables and other items of tangible personal property of every kind, excluding inventory, owned by Seller including those listed in <u>Schedule 1.2(b)</u> (the "Tangible Property"), and all additions or replacements made between the date of this Agreement and the Closing Date (as defined in Section 8.1 below), excluding tangible personal property which is not located in the Real Property.

(c)    <u>Intellectual Property.</u> All Intellectual Property (as defined in Section 2.8) of the Seller, including, without limitation, all rights to the name "Liberty Denim, LLC" and the Intellectual Property listed on <u>Schedule 2.8</u>.

(d)    <u>Permits.</u> To the extent transferable, all permits, authorizations, certificates, approvals, licenses, exemptions, and classifications required for the conduct of the Business and the ownership of the Purchase Assets, except for those the absence of which does not have a Material Adverse Effect (as defined in Section 2.3 below) relating to the Purchased Assets (the "Permits"), but excluding the Permits relating to the Excluded Assets.

(e)    <u>Records.</u> All records, technical data, asset ledgers, books of account, inventory records, budgets, customer and supplier records, computer programs, correspondence, and other files of Seller created or maintained in connection with the Purchased Assets excluding any such data or other information subject to any of the rights or privileges provided by the Federal Rules of Evidence, Federal Rules of Civil Procedure,  federal or state statute or common law; <u>provided, however,</u> Seller will only provide Buyer with a copy of all such records, data, ledgers, books, budgets, programs, correspondence, and files to the extent Seller must maintain actual possession of these items to complete its Bankruptcy Case.

(f)    <u>Service Agreements, Manuals, Etc.</u> Any and all service agreements, warranties, operating agreements, maintenance agreements, manuals, plans, and all similar and other

2

documents relating to the Purchased Assets or the Business which are in the possession or under the control of the Seller (collectively, "Service Agreements").

(g)   Other Assets. Except as set forth in Section 1.3, all other assets of any kind or description, tangible or intangible, which are owned by Seller.

Section 1.3 Excluded Assets. Notwithstanding anything to the contrary in this Agreement, Buyer shall not purchase and Seller shall retain the properties and assets of Seller set forth in this Section 1.3 (all such assets not being acquired by Buyer being herein referred to as the "Excluded Assets").

(a)   Assets. The assets of Seller set forth on Schedule 1.3(a) (and any proceeds from the disposition thereof);

(b)   Causes of Action. Except for those associated with the Purchased Assets, all of Seller's rights to any causes of action or claims arising in connection with the Business, including without limitation, claims for tax refunds, any claims or causes of action related to the Debtor's accounts receivable or claims against any of Seller's customers or suppliers including VF Corporation, Parkdale or their affiliates.

(c)   Seller's Equity. The shares of capital stock of Seller held in treasury, if any.

(d)   Bankruptcy. Any avoidance causes of action Seller or Seller's bankruptcy estate may have against any person or entity whatsoever under chapter 5 of the Bankruptcy Code or applicable state laws.

Section 1.4 Liabilities. For purposes of this Agreement, "Liabilities" shall mean all liabilities, duties, obligations, responsibilities, charges, burdens, or undertakings, of every kind or description, of Seller, whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, whether due or to become due, and whether the claim upon which such liability, duty, obligation, responsibility, charge, burden or undertaking arises is deemed a "claim" within the meaning of Section 101(5) of the Bankruptcy Code, including all liabilities for taxes (each a "Liability"). Seller shall retain all Liabilities.

Section 1.5 Purchase Price. The aggregate purchase price to be paid for the Purchased Assets shall be One Million Five Hundred Eighty Thousand Dollars ($1,580,000) (the "Purchase Price"), One Hundred Fifty Thousand Dollars ($150,000) of which Buyer shall pay to Seller in cash upon execution of this Agreement. The remaining balance of the Purchase Price shall be paid by Buyer to Seller in cash at the Closing.

## ARTICLE 2
## REPRESENTATIONS AND WARRANTIES CONCERNING SELLER

Seller represents and warrants to Buyer as follows:

Section 2.1   Organization and Good Standing. Seller is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of South

Carolina. Seller has all requisite power and authority to own, operate and lease the Purchased Assets owned by it and to conduct the operations of the Business as presently conducted.

Section 2.2 <u>Authority.</u> Subject to the receipt of the Required Consents (as defined in Section 2.3 below) and the Approval Order (as defined in Section 9.1(b) below), Seller has all requisite power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby. The execution, delivery, and performance of this Agreement have been duly and validly authorized by all necessary corporate action on the part of Seller, subject to the entry of the Approval Order. Subject to the entry of the Approval Order, this Agreement has been, or will be at Closing, duly executed and delivered by Seller and constitutes, or will constitute when executed or delivered, a valid and binding obligation of Seller, enforceable against Seller in accordance with its terms except as the enforceability thereof may be limited by bankruptcy, insolvency, reorganization, or other similar laws affecting creditor's rights generally and by principles of equity regarding the availability of certain remedies.

Section 2.3 <u>No Conflict or Breach.</u> Subject to the receipt of the Required Consents and the Approval Order, the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby do not and will not;

(a)    conflict with or constitute a violation of the organizational documents of Seller;

(b)    subject to the entry of the Approval Order, violate any law or any rule or regulation of any governmental body or administrative agency, or conflict with any judicial or administrative order or decree, in either case relating to Seller or the Purchased Assets;

(c)    subject to the entry of the Approval Order, except as set forth on <u>Schedule 2.3</u>, require the consent of, notice to or filing with any United States governmental authority or administrative agency or any private person or firm on behalf of Seller;

(d)    subject to the entry of the Approval Order, conflict with, constitute a default under, result in a breach or acceleration of or, except as set forth on <u>Schedule 2.3</u>, require notice to or the consent of any third party under any contract, agreement, commitment, mortgage, note, license, or other instrument or obligation to which Seller is party or by which Seller is bound or the Purchased Assets are affected; or

(e)    result in the creation or imposition of any Lien on the Purchased Assets;

except (i) with respect to clause (c), such consents or notices as the failure to obtain or give would not have a material adverse effect on the condition (financial or otherwise) of the Business (hereinafter, a "Material Adverse Effect"); and (ii) with respect to clauses (d) and (e), any of the foregoing which do not or will not have a Material Adverse Effect. The matters described on <u>Schedule 2.3</u> are referred to as the "Required Consents."

Section 2.4 <u>Books and Records.</u> The books and records of the Seller are true, accurate and complete and, where appropriate, have been maintained, in all material respects in accordance with generally accepted accounting principles applied on a consistent basis.

4

Section 2.5 <u>Title to Assets; Liens.</u> Seller has good and marketable title to all of the properties and assets (real or personal, tangible, or intangible) owned by it and a valid leasehold or other possessory interest in all other properties and assets used, operated or occupied by it, located on its premises, except for tangible personal property sold or disposed of in the ordinary course of business and consistent with past practice. All of Seller's properties and assets (whether real or personal, tangible or intangible, owned, leased or otherwise acquired) are free and clear of any Liens, other than:

(a)    easements that do not materially affect the full use and enjoyment of the Real Property for the purposes for which it is currently used or materially detract from its value;

(b)    imperfections of title and encumbrances, if any, which, in the aggregate, are not material, do not materially detract from the marketability or value of the properties subject thereto, and do not materially impair the operations of the owner thereof;

(c)    Liens for taxes not yet due and payable; and

(d)    Liens described on <u>Schedule 2.5(d)(i)</u> (which Liens shall be released from the Purchased Assets and shall attach to the proceeds of sale in accordance with the Approval Order), and Liens described on <u>Schedule 2.5(d)(ii)</u>.

The Liens and encumbrances described above (other than the Liens described on <u>Schedule 2.5(d)(ii)</u>) are referred to herein collectively as "Permitted Liens."

Section 2.6 <u>Real Property.</u> <u>Schedule 1.2(a)</u> contains a true and correct description of all (a) the Real Property; (b) Liens upon or affecting any of the Real Property or the Buyer's rights to or interest in any of the Real Property; (c) agreements, oral or written, pursuant to which any person or entity (other than Seller) leases, subleases, occupies or has the right to occupy the Real Property; and (d) agreements and other undertakings, oral or written, to sell, lease, sublease, assign, encumber or otherwise dispose of the Real Property.

Section 2.7 <u>Tangible Personal Property.</u> Seller owns or leases all buildings, machinery, equipment, and other tangible assets necessary for the conduct of the Business. To the knowledge of Seller, each material item of Tangible Property is in operating order, condition and repair, ordinary wear and tear excepted and is of a quality and quantity presently usable in the ordinary course of business.

Section 2.8 <u>Intellectual Property.</u> For purposes of this Section 2.8, "Intellectual Property" means (a) trademarks, copyrights, patents, service marks, trade names, logos, and other designations owned or used by Seller and (b) all computer programs and other computer software (other than off-the-shelf shrink wrapped software), trade secrets, plans and specifications, inventions, know-how, technology, proprietary processes, and formulae necessary or used by Seller in connection with the Business. Seller owns the Intellectual Property that is material to the conduct of the Business (the "Transferred Intellectual Property") and, subject to the entry of the Approval Order, has the right to transfer the Transferred Intellectual Property to Buyer free and clear of all Liens in accordance with this Agreement. The Transferred Intellectual Property consists of all of the intellectual property rights necessary to conduct the Business.

There are no claims or suits pending or, to the knowledge of Seller, threatened against Seller challenging Seller's ownership of or unencumbered right to use any of the Transferred Intellectual Property, nor does there exist any basis therefor. There are no claims or suits pending or, to the knowledge of Seller, threatened against Seller alleging that any of the Transferred Intellectual Property or other Purchased Assets infringes any rights of any third parties, nor does there exist any basis therefor.

Section 2.9 <u>Brokers.</u> No finder, broker, agent, or other intermediary has acted for or on behalf of Buyer in connection with the transactions contemplated by this Agreement, and there are no claims for any brokerage commission, finder's fee, or similar payment due from Buyer.

Section 2.10 <u>Bulk Sale Act.</u>  None of the execution, delivery, or performance of this Agreement constitutes a bulk sale or bulk transfer subject to any applicable bulk sale or bulk transfer act or article of the Uniform Commercial Code, as amended, or any other applicable statute or law (collectively, "Bulk Sale Act").  Seller has complied with the relevant provisions of the applicable Bulk Sale Act.

Section 2.11 <u>Secured Transactions Laws.</u>  None of the execution, delivery, or performance of this Agreement constitutes a foreclosure sale or a disposition of collateral following a default, and none of the execution, delivery, or performance of this Agreement is related to the Seller's exercise of any remedies available to the Seller under Article 9 of the Uniform Commercial Code, as amended, or any other applicable statute or law pertaining to the enforcement of a lien or security interest in or to any of the Purchased Assets (collectively, "Secured Transactions Laws").  Seller has complied with the relevant provisions of the applicable Secured Transactions Laws, including but not limited to the satisfaction of all applicable notice requirements, and the Seller otherwise shall ensure that every aspect of the performance of this Agreement shall be commercially reasonable.

**ARTICLE 3**
**REPRESENTATIONS AND WARRANTIES OF BUYER**

Buyer represents and warrants to Seller as follows:

Section 3.1 <u>Organization and Good Standing.</u> Buyer is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of _____.

Section 3.2 <u>Authority.</u> Buyer has the requisite corporate power and authority to execute, deliver, and perform this Agreement and, subject to entry of the Approval Order, to consummate the transactions contemplated hereby and thereby. The execution, delivery, and performance of this Agreement, and the consummation of the transactions contemplated hereby, have been duly and validly authorized by all necessary corporate action on the part of Buyer. This Agreement has been duly executed and delivered by Buyer and, subject to entry of the Approval Order, constitutes a valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, except as the enforceability thereof may be limited by bankruptcy, insolvency, reorganization, or other similar laws affecting creditor's rights generally and by principles of equity regarding the availability of remedies.

Section 3.3 <u>No Conflict or Breach.</u> The execution, delivery, and performance of this Agreement does not and will not (a) conflict with or constitute a violation of the Articles of Incorporation or Bylaws of Buyer; (b) conflict with or constitute a violation of any law, statute, judgment, order, decree, or regulation of any court, administrative agency, governmental authority, or arbitrator applicable to or relating to Buyer; (c) constitute a breach or default under any contract or any other agreement or instrument by which Buyer is bound; or (d) require any consent, notice to or filing with any governmental authority or administrative agency or any private person or firm on behalf of Buyer other than the Approval Order of the Bankruptcy Court and the filing of notification and report forms under the Hart-Scott-Rodino Improvements Act of 1976, as amended (the "HSR Act").

Section 3.4 <u>Financial Capability of Buyer.</u> Buyer has the capability and funding resources to close and consummate the transactions contemplated by this Agreement and to perform its obligations hereunder.

Section 3.5 <u>No Other Representations.</u> Buyer acknowledges that other than as set forth in Article 2, Seller has made no other representations or warranties, and Buyer has conducted its own due diligence with respect to the Business and the Purchased Assets and other matters contemplated in this Agreement and has relied upon such due diligence and the representations and warranties set forth in Article 2. The Purchased Assets are being sold, transferred and conveyed by Seller on an "AS IS, WHERE IS" basis and there are no representations of warranty relating to the title (other than as may be set forth in Article 2) possession, quiet enjoyment or any physical, environmental, health or safety conditions existing in, on at, or relating to the Purchased Assets. Seller disclaims any warranty, expressed or implied, of merchantability or fitness for any particular purpose as to any portion of the Purchased Assets.

Section 3.6 <u>Brokers.</u> No finder, broker, agent, or other intermediary has acted for or on behalf of Seller in connection with the transactions contemplated by this Agreement, and there are no claims for any brokerage commission, finder's fee, or similar payment due from Seller.

Section 3.7 <u>Resale.</u> The Seller shall not be responsible for any costs, expenses, or brokerage fees that become due and owing in connection with any resale of the Purchased Assets or the Business, unless Seller enters into a written agreement to the contrary.

## ARTICLE 4
## COVENANTS OF SELLER

Seller covenants and agrees with Buyer as follows:

Section 4.1 <u>Conduct of Business.</u> Subject to any orders of the Bankruptcy Court to the contrary, between the date of this Agreement and the Closing Date, Seller shall keep the Business and the Purchased Assets substantially intact and shall maintain physical facilities, all as they exist on the date of this Agreement.

Section 4.2 <u>Required Consents.</u> Seller shall use all commercially reasonable efforts to obtain all Required Consents reasonably necessary for the adoption and approval of this Agreement, the sale of the Purchased Assets, and for such other purposes as may be necessary or desirable in connection with effectuating the transactions contemplated hereby.

Section 4.3 <u>Break-Up Fee.</u> Seller shall grant to Buyer an administrative priority claim in exchange for a break-up fee equal to Fifty Thousand Dollars ($50,000) (the "Break Up Fee") in the event that Seller sells, transfers, or otherwise disposes directly or indirectly, including through an asset sale, stock sale, merger, or other similar transaction, all or substantially all or a material portion of the Purchased Assets in a transaction or series of transactions with one or more parties other than Buyer at a minimum collective purchase price of One Million Six Hundred Fifty-Five Thousand Dollars ($1,655,000) (such event being an "Alternative Transaction"); provided that no administrative priority claim shall be granted to Buyer pursuant to this Section 4.3 following a termination of this Agreement by Seller pursuant to Section 10.1(b). The Break-Up Fee shall only be paid by Seller to Buyer at the closing in connection with an Alternative Transaction and from the proceeds thereof. Notwithstanding the foregoing, no closing shall occur in connection with an Alternative Transaction unless Buyer shall have been paid the Break-Up Fee prior thereto or at such closing from the proceeds thereof.

## ARTICLE 5
## MUTUAL COVENANTS

Each of Buyer and Seller covenants and agrees with the other as follows:

Section 5.1 <u>Cooperation.</u> Buyer and Seller shall use commercially reasonable efforts to make or obtain all consents, approvals, authorizations, registrations, and filings with all federal, state, or local judicial or governmental authorities or administrative agencies as are required in connection with the consummation of the transactions contemplated by this Agreement.

Section 5.2 <u>Confidentiality.</u> In recognition of the confidential nature of certain of the information which will be provided to each party by the other, Buyer and Seller each agrees to retain in confidence, and to require their respective directors, officers, employees, consultants, professional representatives, and agents (collectively, the "Representatives") to retain in confidence all information transmitted or disclosed to it by another party to this Agreement, and further agrees that it will not use for its own benefit and will not use or disclose to any third party, or permit the use or disclosure to any third party of, any information obtained from or revealed by the other, except that Buyer and Seller may disclose the information to those of its Representatives who need the information for the proper performance of their assigned duties with respect to the consummation of the transactions contemplated by this Agreement. In making such information available to its Representatives, Buyer and Seller shall take any and all precautions necessary to ensure that its Representatives use the information only as permitted by this Agreement. Notwithstanding anything to the contrary in the foregoing provisions, such information may be disclosed (a) where it is required to be disclosed by any order of any regulatory authorities or governmental agencies; (b) if it is required by court order or decree or applicable law; (c) if it is readily ascertainable or obtained from public or published information; (d) if it is received from a third party not known to the recipient to be under an obligation to keep such information confidential; or (e) if the recipient can demonstrate that such information was in its possession prior to disclosure of the information in connection with this Agreement. If any party shall be required to make disclosure of any such information by operation of law, such disclosing party shall give the party from whom such information was received prior notice of the making of such disclosure and shall use all reasonable efforts to afford such other party an opportunity to contest the making of such disclosure. In the event that the Closing shall not occur; Buyer and Seller shall

8

immediately deliver, or cause to be delivered, to the party from whom such information was received (without retaining any copies) any and all documents, statements or other written information obtained from the other that contain confidential information.

## ARTICLE 6
## CONDITIONS PRECEDENT TO BUYER'S OBLIGATIONS

The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to the satisfaction of the following conditions on or before the Closing Date, unless specifically waived in writing by Buyer prior to the Closing Date; provided, however, that Buyer may not waive the condition that the Approval Order specified in Section 6.3 has been entered (although Buyer may waive the condition that such Approval Order not be subject to appeal):

Section 6.1 Representations and Warranties. The representations and warranties of Seller contained in this Agreement shall have been true and correct on the date of this Agreement and shall be true and correct on the Closing Date as though made on and as of the Closing Date.

Section 6.2 Compliance with Covenants. Seller shall have duly performed and complied with all covenants, agreements, and obligations required by this Agreement to be performed or complied with on or prior to the Closing.

Section 6.3 Bankruptcy Court Approval; Consents and Approvals. All Required Consents shall have been made or obtained or shall have occurred. The Bankruptcy Court shall have entered the Procedure Order (as defined in Section 9.1(a)) and the Approval Order (as defined in Section 9.1(b)). The Procedure Order and the Approval Order shall be in a form and substance satisfactory to Buyer; the Approval Order shall not have been reversed, modified, rescinded, or stayed as of the Closing Date; and either (a) the time to appeal the Approval Order has expired and the Approval Order is no longer subject to appeal or further judicial review, or (b) the Approval Order makes an express finding that Buyer is a good faith purchaser entitled to the benefits of Section 363(m) of the Bankruptcy Code.

Section 6.4 Removal of Liens. Seller shall have obtained fully executed releases from the holders of all Liens described on Schedule 2.5(d)(i), or the Bankruptcy Court shall have entered the Approval Order, providing, among other things, that such Liens attach to the proceeds of the sale and that the Purchased Assets shall be acquired by Buyer free and clear of all Liens other than the Permitted Liens and the Assumed Liabilities.

## ARTICLE 7
## CONDITIONS PRECEDENT TO SELLER'S OBLIGATIONS

The obligations of Seller to consummate the transactions contemplated by this Agreement are subject to the satisfaction of each of the following conditions on or before the Closing Date, unless specifically waived in writing by Seller prior to the Closing; provided, however, that Seller may not waive the condition that the Approval Order specified in Section 7.4 has been entered:

Section 7.1 Representations and Warranties. The representations and warranties of Buyer contained in this Agreement shall have been true and correct on the date of this Agreement, and shall be true and correct on the Closing Date as though made on and as of the Closing Date.

9

Section 7.2 <u>Compliance with Covenants.</u> Buyer shall have duly performed and complied with all covenants, agreements, and obligations required by this Agreement to be performed or complied with by it on or before the Closing Date.

Section 7.3 <u>Absence of Litigation.</u> No action or proceeding shall be pending or threatened by or before any court or other governmental body or agency seeking to restrain, prohibit, or invalidate the transactions contemplated by this Agreement (other than a pending or threatened appeal of the Approval Order, so long as no stay is obtained or otherwise in effect with respect to the Approval Order).

Section 7.4 <u>Bankruptcy Court Approval; Consents and Approvals.</u> The Bankruptcy Court shall have entered the Procedure Order (as defined in Section 9.1(a)) and the Approval Order (as defined in Section 9.1(b)), and all Required Consents shall have been obtained.

Section 7.5 <u>Payment of Certain Fees, Expenses, Costs, Taxes, Etc.</u> Buyer shall pay for its own attorney's fees, any survey fees, any filing or recording costs or fees, and any transfer and/or deed fees and/or taxes.

## ARTICLE 8
## CLOSING

Section 8.1 <u>Closing.</u> The closing of the sale of the Purchased Assets (the "Closing") shall take place at the offices of the Skinner Law Firm, LLC in Greenville, South Carolina, at 10:00 a.m., local time, within two (2) business days following the satisfaction or waiver of all conditions set forth in Articles 6 and 7, including without limitation the conditions with respect to the entry of the Approval Order by the Bankruptcy Court. The date of the Closing is referred to as the "Closing Date." The Parties will ask the Bankruptcy Court to appoint separate Special Counsel for purposes of the real estate transactions at the Closing.

Section 8.2 <u>Deliveries by Seller.</u> At the Closing, Seller shall deliver or cause to be delivered to Buyer the following:

(a)    such instruments of conveyance or assumption as may be required or contemplated by this Agreement, all of which shall be in form and substance reasonably satisfactory to Buyer, including:

(i)  a statutory warranty deed;

(ii) an owner's title affidavit in form and substance reasonably satisfactory to the title insurance company insuring Buyer's fee simple title to the Real Property; and

(iii) a quitclaim bill of sale for all Tangible Property and Intellectual Property owned by Seller located at the Premises;

(b)    all Service Agreements, unless otherwise agreed between the parties in writing; and

(c)    all bank books, financial and bank records, bookkeeping and accounting records, copies of all tax returns and amendments to all of the foregoing, minute books, stock ledgers, and all other books and records of or relating to Seller pursuant to Section 1.2(f).

Section 8.3 <u>Deliveries by Buyer.</u> At the Closing, Buyer shall deliver or cause to be delivered to Seller the following:

(a)    An officer's certificate of Buyer confirming the satisfaction of the conditions set forth in Sections 7.1 and 7.2 as to representations, warranties, and covenants;

(b)    a copy of all corporate actions authorizing the execution, delivery, and performance of this Agreement, and the consummation of the transactions contemplated hereby, accompanied by the certification of the Secretary of Buyer to the effect that such actions are in full force and effect and have not been amended, modified, or rescinded;

(c)    such instruments of conveyance or assumption as may be required or contemplated by this Agreement, all of which shall be in form and substance reasonably satisfactory to Seller; and

(d)    the Purchase Price, payable as provided in Section 1.5.

Section 8.4 <u>Taxes</u>.    The Seller will remain solely responsible for all federal, state, local or foreign taxes incurred (a) in connection with the operation of the Business prior to Closing, (b) in respect of the income of the Seller earned or realized prior to Closing and (c) in respect of any gain and income from the sale of the Purchased Assets.  The 2012 ad valorem taxes levied on the Purchased Assets shall be paid pro rata by the Seller and the Buyer based upon the relative number of days during the 2012 tax year in which the Seller and Buyer owned the Purchased Assets.  As set forth in Section 7.5 above, Buyer shall be responsible for paying any filing or recording costs or fees, and any transfer and/or deed fees and/or taxes.

Section 8.5 <u>Further Assurances.</u> Seller shall, at any time on or after the Closing Date, take any and all steps requested by Buyer to transfer to Buyer ownership of the Purchased Assets, and will do, execute, acknowledge, and deliver all such further acts, deeds, assignments, transfers, conveyances, powers of attorney, and assurances as may be requested for the more effective transfer to Buyer, or its successors or assigns, of operating control of the Business.

## ARTICLE 9
## BANKRUPTCY COURT ACTION

Section 9.1 <u>Bankruptcy Court Action.</u> In addition to the other conditions set forth in Article 6 (with respect to Buyer) and Article 7 (with respect to Seller), Buyer and Seller acknowledge and agree that Buyer's obligation to purchase, and Seller's obligation to sell, the Purchased Assets, is subject to the entry of the Procedure Order and the Approval Order by the Bankruptcy Court.

(a)    <u>Bankruptcy Court Approval of Bid Procedure.</u> Seller and Buyer have agreed to the form of bidding procedures attached hereto as <u>Exhibit B</u>. Seller will request that the Bankruptcy Court enter an order establishing the Bidding Procedures. For purposes of this Agreement, "Procedure Order" shall mean an order of the Bankruptcy Court establishing and approving the Bidding Procedures attached hereto as <u>Exhibit B</u>, or such other bid procedures and bid protections as have been approved by Buyer in its sole discretion (the "Bidding Procedures"), At Seller's request, Buyer shall provide evidence that Buyer has the capability and funding resources to close and consummate the transactions contemplated by this Agreement and shall otherwise comply with all provisions contained in the Procedure Order.

11

(b)    Bankruptcy Court's Approval of Sale. Seller has filed a motion with the Bankruptcy Court (the "Sale Motion") requesting entry of an order approving the transactions contemplated in this Agreement. For purposes of this Agreement, "Approval Order" shall mean an order of the Bankruptcy Court in form and substance satisfactory to Buyer and shall, among other things, (i) approve the sale of the Purchased Assets to Buyer on the terms and conditions set forth in this Agreement and authorize and direct Seller to proceed with this transaction, (ii) include a specific finding that Buyer is a good faith purchaser of the Purchased Assets for purposes of Section 363(m) of the Bankruptcy Code, (iii) state that the Purchased Assets shall be sold and transferred to Buyer free and clear of all Liens, claims, interests, encumbrances, and pension liabilities, including without limitation, any liability, claim or obligation that is or may be asserted (before or after Closing) by the Pension Benefit Guaranty Corporation or any other party with respect to any pension plan of Seller or any affiliate of Seller, successor liability claims, and other Liabilities and obligations, of every kind or description, to the fullest extent permitted by the Bankruptcy Code and applicable non-bankruptcy law, including without limitation any successor liability claims (except only for Permitted Liens as and to the extent expressly provided in this Agreement), (iv) state that the interest in and claims and rights under contracts and leases sold to Buyer under this Agreement shall be assigned or transferred to Buyer notwithstanding a provision on any such contract or lease or applicable law that prohibits, restricts, or conditions the assignment or transfer of such contract or lease; (v) provide for a waiver of the stays contemplated by Bankruptcy Rules 6004(h) and 6006(e); (vi) contain a finding that Buyer has not engaged in any of the acts prohibited by Section 363(n) of the Bankruptcy Code; and (vii) to contain such other findings of fact, conclusions of law, and orders reasonably required by Buyer and its counsel. Seller shall use all reasonable efforts to obtain prompt entry of the Approval Order and Buyer agrees to cooperate with the Seller in connection with such efforts.

Section 9.2 Public Announcements. Seller and Buyer will consult with each other before, and obtain the other party's consent with respect to, issuing any press release or otherwise making any public statements with respect to this Agreement and the transactions contemplated hereby, and shall not issue any such press release or make any such public statement prior to such consultation and consent, except to the extent that compliance with law requires a party to issue a press release or public announcement with such consultation and consent or except as required to be filed with the Bankruptcy Court. Any consent required pursuant to the preceding sentence shall not be unreasonably withheld or delayed.

Section 9.3 Notice of Sale. Seller shall have served a copy of a notice of sale of the Purchased Assets to Buyer upon (i) to the knowledge of Seller, all creditors of Seller and all other persons who are parties in interest in the Bankruptcy Case, (ii) to the knowledge of Seller, all persons with Liens and respect to or other interests in any of the Purchased Assets, (iii) sponsors and trustees under any employee benefit plan of Seller, (iv) all other persons required to receive notice of the sale pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure, (v) all applicable state and federal government authorities, agencies, departments, and regulators, (vi) all other persons designated by Buyer, which such designees must be designated, and which such notices for such designees must be paid for and completed, all by Buyer on or before two days after entry of the Procedure Order and  (vii) all parties who have previously expressed an interest in the purchase of the assets of the Seller.

**ARTICLE 10**
**TERMINATION**

12

Section 10.1 <u>Termination.</u> This Agreement may be terminated at any time prior to the Closing:

(a)    By the mutual written consent of Seller and Buyer at any time prior to Closing;

(b)    Seller (if Seller is not then in breach of any term of this Agreement), if Buyer shall (i) fail to perform or observe in any material respect any covenant, agreement, or condition contained in this Agreement required to be performed or observed on or prior to the Closing Date; or (ii) materially breach any of its representations or warranties contained in this Agreement, which failure or breach is not cured within five (5) days after Seller has notified Buyer of its intent to terminate this Agreement pursuant to this subparagraph;

(c)    By Buyer (if Buyer is not then in breach of any term of this Agreement), if Seller shall (i) fail to perform or observe in any material respect any covenant, agreement, or condition contained in this Agreement required to be performed or observed on or prior to the Closing Date; or (ii) materially breach any of its representations or warranties contained in this Agreement, which failure or breach is not cured within five (5) days after Buyer has notified Seller of its intent to terminate this Agreement pursuant to this subparagraph; or

(d)    By Seller or by Buyer, if there shall be any order, writ, injunction, or decree of any court or governmental or regulatory agency binding on Seller, or on Buyer, which prohibits or restrains any party from, consummating the transactions contemplated by this Agreement.

Section 10.2 <u>Effect of Termination.</u> Each party's right of termination under Section 10.1 above is in addition to any other rights such party may have under this Agreement or otherwise, and any exercise of such right of termination will not be an election of remedies. Notwithstanding the foregoing, termination of this Agreement pursuant to this Article 10 shall terminate all obligation of the parties hereunder, except for the obligations under Sections 5.2 (with respect to confidentiality), 9.2 (with respect to publicity), and 12.1 (with respect to expenses), and Articles 10 and 12; <u>provided</u>, <u>however</u>, that termination pursuant to subparagraphs (b) or (c) of Section 10.1 shall not relieve the defaulting or breaching party from any liability to any other party under this Agreement.

**ARTICLE 11**
**INDEMNIFICATION**

Section 11.1 <u>Indemnifications by Seller.</u>  The Seller hereby indemnifies, defends, and agrees to hold harmless Buyer and Buyer's officers, agents, and employees from and against any and all claims, demands, liabilities, judgments, damages, settlements, costs, and expenses (including but not limited to court costs and reasonable attorneys' fees) that may be sustained or incurred by Buyer as a result of any material misrepresentation of the warranties more fully described herein.

Section 11.2 <u>Indemnifications by Buyer.</u>  The Buyer hereby indemnifies, defends, and agrees to hold harmless Seller and Seller's officers, agents, and employees from and against any and all claims, demands, liabilities, judgments, damages, settlements, costs, and expenses (including but not limited to court costs and reasonable attorneys' fees) that may be sustained or

incurred by Seller as a result of any material misrepresentation of the warranties more fully described herein.

## ARTICLE 12
## MISCELLANEOUS

Section 12.1 <u>Expenses.</u> Except as otherwise provided herein, all costs and expenses incurred in connection with this Agreement and the transactions contemplated by this Agreement shall be paid by the party incurring such expense, whether or not the sale of the Purchased Assets is consummated. Seller shall be responsible for all expenses incurred in connection with obtaining the Required Consents.

Section 12.2 <u>Risk of Loss.</u> The risk of loss, damage, or condemnation of any of the Purchased Assets from any cause whatsoever shall be borne by Seller at all times prior to the completion of the Closing.

Section 12.3 <u>Tax Filings.</u> Each of the parties acknowledges its understanding of the requirement under Section 1060 of the Code for the filing by each of Form 8594 for its respective tax year in which the Closing occurs. Seller and Buyer agree to allocate the Purchase Price among the Purchased Assets as provided in <u>Schedule 12.3</u>.

Section 12.4 <u>Best Efforts.</u> Each party to this Agreement agrees to use its best efforts to satisfy the conditions to the Closing set forth in this Agreement and otherwise to consummate the transactions contemplated by this Agreement.

Section 12.5 <u>Notices.</u> All notices, demands and other communications made hereunder shall be in writing and shall be given either by personal delivery, by nationally recognized overnight courier (with charges prepaid), or by facsimile (with telephone confirmation), and shall be deemed to have been given or made when personally delivered, the day following the date deposited with such overnight courier service or when transmitted to facsimile machine and confirmed by telephone, addressed to the respective parties at the following addresses (or such other address for a party as shall be specified by like notice):

If to Seller:
Liberty Denim, LLC
101 Mills Avenue
Liberty, South Carolina 29657
Attention: Michael Rickman
Tel.: _____
Fax: _____

With a copy (which shall not constitute notice) to:
Skinner Law Firm, LLC
The Ogletree Building
300 North Main Street, Suite 201
Greenville, SC 29601
Attention:  Randy A. Skinner
Tel.: (864) 232-2007
Fax: (864) 232-8496

14

If to the Creditors' Committee:
Shumaker, Loop & Kendrick, LLP
128 South Tryon Street
Suite 1800
Charlotte, North Carolina 28202
Attention: David H. Conaway, Esq.
Tel.: (704) 375-0057
Fax: (704) 332-1197

If to Buyer:

Real Estate Diversified, LLC
11425 Cronhill Drive, Suite A
Owings Mills, Maryland 21117
Tel.: _____
Fax: _____

With a copy (which shall not constitute notice) to:
Nelson Mullins Riley & Scarborough, LLP
Meridian, 17th Floor
1320 Main Street
Columbia, South Carolina 29201
Attn: Frank B.B. Knowlton
Tel.: (803)255-9588
Fax: (803) 256-7500

Section 12.6 Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

Section 12.7 Assignment. This Agreement shall be binding upon and inure to the benefit of the parties to this Agreement and their respective successors and permitted assigns. Neither this Agreement nor any of the rights, interests, or obligations hereunder shall be assigned by any of the parties to this Agreement (other than an assignment by Buyer to one or more affiliates of Buyer) without the prior written consent of all other parties to this Agreement, and any purported assignment without such consent shall be void; provided that Buyer shall remain liable for the payment of the Purchase Price in accordance with Section 1.5 notwithstanding any assignment of other rights or obligations under this Agreement to an affiliate of Buyer. For purposes of this Section 12.7, an "affiliate" of Buyer shall mean any entity of which Buyer owns, directly or indirectly, at least 51% of such entity's common stock or other capital stock entitled to vote or other comparable equity interests.

Section 12.8 Third Party Beneficiaries. None of the provisions of this Agreement or any document contemplated by this Agreement is intended to grant any right or benefit to any person or entity which is not a party to this Agreement.

Section 12.9 Number, Gender, and Headings. As used herein, the singular shall include the plural and the plural may refer to only the singular.  The use of any gender shall be applicable to all genders.  The article and section headings contained in this Agreement are solely for the

15

purpose of reference, are not part of this Agreement and shall not in any way affect the meaning or interpretation of this Agreement.

Section 12.10 Recitals. The recitals set forth at the beginning of this Agreement are incorporated by reference in, and made a part of, this Agreement.

Section 12.11 Amendments. Any waiver, amendment, modification, or supplement of or to any term or condition of this Agreement shall be effective only if in writing and signed by all parties hereto, and the parties to this Agreement waive the right to amend the provisions of this Section 12.11 orally.

Section 12.12 Governing Law. This Agreement shall be governed by the laws of the State of South Carolina without giving effect to its conflicts of laws provisions.

Section 12.13 Severability. In the event that any provision in this Agreement shall be determined to be invalid, illegal, or unenforceable in any respect, the remaining provisions of this Agreement shall not be in any way impaired, and the illegal, invalid, or unenforceable provision shall be fully severed from this Agreement and there shall be automatically added a replacement provision as similar in terms and intent to such severed provision as may be legal, valid, and enforceable.

Section 12.14 Entire Agreement. This Agreement and the Schedules and Exhibits to this Agreement, together with the documents and instruments delivered pursuant to this Agreement, constitute the entire contract between the parties to this Agreement pertaining to the subject matter of this Agreement, and supersede all prior and contemporaneous agreements and understandings between the parties with respect to such subject matter.

Section 12.15 Construction. Each party to this Agreement and its counsel have reviewed and revised this Agreement. The normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or of any amendments, schedules, or exhibits to this Agreement. The word "including" shall mean including without limitation.

Section 12.16 Time of Essence. With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

Section 12.17 Knowledge. Whenever used herein with respect to a party, the term "knowledge" shall mean the actual knowledge of such party's executive officers after reasonable investigation.

Section 12.18 Dispute Resolution; Payment of Court Costs and Fees. Any controversy or claim arising out of or related to this Agreement, or any alleged breach of the terms hereof, shall be adjudicated by the Bankruptcy Court. All costs and fees incurred by both parties in connection with a controversy or claim arising out of or related to this Agreement, or any alleged breach of the terms hereof, including but not limited to their respective attorneys' fees and the fees to be paid to the Bankruptcy Court, shall be paid by the party who is deemed by the Bankruptcy Court to be in default under the terms of this Agreement; unless the Bankruptcy Court apportions the costs and fees incurred in connection with such controversy or claim in a different manner or proportion.

[Signatures on following page.]

16

      IN WITNESS WHEREOF, each of the parties has signed this Agreement, or has caused this Agreement to be signed by its duly authorized officer, as of the date first above written.

**<u>SELLER:</u>**

**LIBERTY DENIM, LLC**

By: _____

Name: _____

Title: _____


**<u>BUYER:</u>**

**REAL ESTATE DIVERSIFIED, LLC**

By: _____

Name: _____

Title: _____

**Schedule 1.2(a)**
**Real Property**

1.  All of the real property commonly known as 500 Maplecroft Street, City of Liberty, County of Pickens, State of South Carolina 29657, Parcel Number (TMS) 4087-12-85-7244, and consisting of approximately 7.33 acres as set forth in the plat entitled "Survey and Certification for Liberty Denim, LLC" prepared by John F. Tinsley, PLS # 16824 dated November 24, 2008 and recorded December 12, 2008 in Plat Book 593, Page 84 in the Office of the Register of Deeds for Pickens County, South Carolina;

2.  All of the real property identified as Vacant Lot Nos. 5, 6, and 7 on the East Side of West Beattie Street, City of Liberty, County of Pickens, State of South Carolina 29657, Parcel No. (TMS) 4097-06-27-8793, and consisting of approximately 0.42 acres as set forth in the plat entitled "Survey and Certification for Liberty Denim, LLC" prepared by John F. Tinsley, PLS # 16824 dated September 8, 2008 and recorded December 12, 2008 in Plat Book 593, Page 81 in the Office of the Register for Pickens County, South Carolina;

3.  All of the real property commonly known as 17 East Beattie Street, City of Liberty, County of Pickens, State of South Carolina 29657, Parcel No. (TMS) 4097-10-46-1554, and consisting of approximately 19.56 acres as set forth in the plat entitled "Survey and Certification for Liberty Denim, LLC" prepared by John F. Tinsley, PLS # 16824 dated September 8, 2008 and recorded December 12, 2008 in Plat Book 593, Page 87 in the Office of the Register of Deeds for Pickens County, South Carolina and the plat entitled "Survey and Certification for Liberty Denim, LLC" prepared by John F. Tinsley, PLS # 16824 dated September 8, 2008 and recorded December 12, 2008 in Plat Book 593, Page 86 in the Register of Deeds Office for Pickens County, South Carolina; ;

4.  All of the real property commonly known as 101 Mills Avenue, City of Liberty, County of Pickens, South Carolina 29657 consisting of approximately 5.56 acres as set forth in the plat entitled "Survey and Certification for Liberty Denim, LLC" prepared by John F. Tinsley, PLS # 16824 dated September 8, 2008 and recorded December 12, 2008 in Plat Book 593, Page 89 in the Office of the Register of Deeds for Pickens County, South Carolina.

## Schedule 1.2(b)
## Tangible Property

1.  1 1997 Ford F150 Truck with approximately $154,000 miles
2.  9 Dell desktop computers
3.  4 HP Printers (approximately $150 value each)
4.  4 HP Printers (approximately $50 value each)
5.  1 Lenox Server
6.  1 IBM Server
7.  1 HP Server
8.  3 West Point Ball Warpers with Continous Creels
9.  1 Barber Coleman Section Beam Warper with Reed Chatwood Creel
10. 1 Morrison Indigo Dye Range with 24 end creel and Strandberg Monitoring
11. 7 West Point re-beamers
12. 1 New West Point Slasher with 12 position creel
13. 1 West Point Slasher with new size boxes and head end, 12 position creel, max width 60" section beams
14. 105 220cm width Picanol Omni Air Jet Looms
15. 1 Curlin-Herbert Sueder
16. 1 Morrison Finishing Range with Strandberg Monitoring, Alexico roll craddel and rail stitcher
17. 1 Morrison Sanforizer with Strandberg Monitoring Finish Inspection Modcule with Plailer
18. 3 Alexico Inspection Frames

**<u>Schedule 1.3(a)</u>**
**Excluded Assets**

1.  Cash
2.  Accounts Receivable
3.  Contract Rights
4.  Insurance Proceeds
5.  Deposit Accounts
6.  Investment Property
7.  Books and Records related to accounts receivable
8.  Inventory

## __Schedule 2.3__
## Required Consents

None

## Schedule 2.5(d)(i)
### Liens to be Removed at Closing

1.  Atkins Machinery, Inc. – PO Box 3487, Spartanburg, SC 29304 – Mortgage on all Real Property listed on Schedule 1.2(a) and UCC liens (entered 8/4/08 and 2/25/10)  on all equipment, furniture, furnishings, fixtures, machinery, books and records

2.  B&D Marine and Industrial Boilers, Inc. – 14 Oakvale Road, Suite B, Greenville, SC 29611 – Mechanic's lien (entered 2/23/12) on Real Property at 101 Mills Avenue, Liberty, SC 29657

3.  Wells Fargo Business Credit, Inc. – 2460 W. 26th Avenue, Suite 120-C, Denver, CO 80211 – UCC lien (entered 7/23/08) on all inventory and all other property including but not limited to general intangibles, inventory, instruments, documents, and books and records to the extent they are or relate to the Purchased Assets as defined in the Agreement

4.  Pickens County, South Carolina Tax Assessor lien on all real property for outstanding 2011 real property taxes

## <u>Schedule 2.5(d)(ii)</u>
### Permitted Liens

None

## **Schedule 12.3**
### **Tax Allocation of Purchase Price**

To be determined between the parties.